We have four cases on the calendar this morning, a tax case from the Court of Federal Claims, two patent cases, a government employee case. One of the patent cases has been submitted on the briefs and may not be argued. Our first case is Glenn Yamagata, et al. v. United States, 2014-5065. Mr. Wilson is speaking first. Yes, Your Honor. May I approach? Please. Good morning, Your Honors, and may it please the Court. At issue is whether FLPJ, a Japanese entity owned by plaintiffs, possess sufficient corporate characteristics, here three out of four, to be taxed as a corporation rather than as a partnership. Plaintiffs concede that FLPJ possess one of these characteristics, continuity of life. However, on cross motions or summary judgments, the trial court was wrong to rule that all three of the other corporate characteristics are present. I will address them in the order presented in the briefs, in the order in which they appear in the regulations. However, one overarching consideration must be kept in mind. The kinder regulations are biased in favor of partnerships. They were promulgated as a response to a flurry of judicial decisions, upholding the taxation of entities as corporations for the favorable tax benefits that attended to that. Well, we don't deal with bias, do we? We just look at the four qualifications. Yes, the bias goes to the intent underlying the kinder regulations and the manner in which they must be interpreted when applied to the facts of this case. The government at the time was casting a wide partnership net to ensnare as many entities as possible. In this case, FLPJ gets caught in that net, which in this instance does not suit defendants. With that in mind, I'd like to turn first to the centralization of management. Except that they didn't get caught in that net, right? I mean, for years you claimed that you were a corporation, and then when you got a different tax ruling in Japan, you tried to change that. So they never did aggressively use those regulations to declare you a partnership over your objections until much later on. FLPJ was initially formed as a kabushiki kaisha in Japan, a KK, which is akin to a corporation. But it wasn't just formed as a kabushiki kaisha. It also qualified as a dozoku kaisha, which is akin to a small, close corporation, which is akin to a family-owned corporation with just two owners. The reason it was formed as a kabushiki kaisha is that in Japan, that elevates the company to a lot higher status. And in 1996 and forwards, they started checking the box after the Kintner regulations were abolished by the check-the-box regulations as a partnership. The point is, FLPJ always operated as a partnership, regardless of how it was classified in Japan. And under the Kintner regulations, we do not look to how it was classified at the time. A limited partnership could be treated as a corporation, or a corporation, nominally called a corporation, could be treated as a partnership. As to the centralization of management, I'd like to focus on the parenthetical language at issue, which says that an organization has centralized management if any person or any group of persons, and this is important, which does not include all the members, has continuing exclusive authority to make management decisions. That parenthetical language states that when all of the members are in the group with management authority, there is no centralization of management. It's clear and it's unambiguous, and the trial court correctly agreed that for the years in which all of the entities' members are present in the group with management authority, there is no centralized management. However, the trial court erred by holding that after plaintiffs placed their shares in S-corporation holding companies, for no other reason than to just hold the shares, centralized management was no longer present because, and I quote, Mon and Yamagata did not own shares in FLPJ as individuals, and were therefore not members of the organization within the meaning of the Kintner regulation. The court's opinion is thus premised on the requirement that the shares be held by the members as individuals. However, the Kintner regulations draw no distinction between forms of ownership. The fact that Mon and Yamagata placed their shares in 1992 in holding companies has no effect on who actually owned FLPJ. But those holding companies are different legal entities, are they not? They are separate legal entities, but in effect, as is recognized in Morton v. United States, which was decided by the judge initially presiding in this case, that an S-corporation passed through holding company is nothing but the alter ego of the individual holding the shares in that holding company. Both this case and Morton involve the question of whether the owner of an S-corporation and the S-corporation itself are one and the same for tax purposes. As I just explained, Morton said that they are. This is different from the case of Zuckman, which the trial court pinned its ruling on. Zuckman dealt with constructive ownership issues and involved entities very different from the ones at issue in this case. Zuckman did not mention S-corporations. The court in Zuckman was asked to determine whether a 51% interest in a limited partnership traveled up a chain of two additional entities to the individual owner. The entities in that chain of ownership were not entities formed for the sole purpose of holding shares in a corporation. They had boards of directors to manage their affairs. In this case, we have just one entity between each plaintiff and FLPJ, the underlying taxpayer. Entities with no other members, no boards, and no purpose other than to hold the shares in the company. The holding companies here fit the Morton decision rather than Zuckman, and ultimately, FLPJ's owners at all times were plaintiffs, not the underlying companies. What about free transferability? As for free transferability, Your Honor, the last of the kind of regulation factors like to focus on the right of first refusal and the restrictions that were placed on those shares. Upon Gene Yamagata's death, one of the owners of FLPJ. Looking first to the right of first refusal, for free transferability to exist, each member must be able, without the consent of the other member, to confer upon his substitute all of the attributes of his interest in the organization. A right of first refusal, where the seller must first offer his interest to the other member, allows the other member to prevent the transfer to a substitute, thus precluding free transferability. However, the regulations recognize that... Well, just because there is that right of first refusal doesn't prevent it from being transferred. Even if, say, a market value is not correct. It's just a question of to whom it's transferred. In that situation, it would be transferred to the other member, not to somebody that the transferring member was free to choose at whatever price he was able to get on the open market. He was basically forced to transfer it to the other member. That is not free transferability. That's a forced transfer to the other member. But at fair market value. There's no requirement in the settlement agreement governing the parties that the transfer happen at fair market value. The Kintner regulations... Is there any requirement that it be at the receiving person's set price? No, the settlement agreement speaks not to price in respect to the transfer between the owners. It just speaks to a right of first refusal. It must first be offered to the non-selling shareholder. Well, if the non-selling shareholder doesn't give a fair price, then isn't the other party allowed to go out and sell it to somebody else at fair market value? Well, the selling party must specify a price, but the settlement agreement doesn't define what that price should be or set up a mechanism. It says that the selling shareholder cannot then turn around and sell it to somebody on the open market for a better price than he offered it to the receiving shareholder. I'm still not following how this would force them to sell at less than fair market value. You could try and sell it for more than fair market value to the non-selling shareholder. For example, if you had a competitor trying to effect a hostile takeover, he knows he can get a premium for it out on the open market. He could sell it to the non-selling shareholder or offer to sell to the non-selling shareholder at an inflated price. Obviously, the non-selling shareholder says that's too much and refuses, and then the selling shareholder can turn around on the open market and attempt to sell it. That sounds like free transferability to me. Well, in order for free transferability... It seems like your definition of free transferability is there can be no restriction in any way whatsoever on the right of the party to transfer. That doesn't seem to me to be what the Kintner Regulations require. Reading the language from the Kintner Regulations themselves, the language states, if each member can transfer his interest to a non-member only after having offered such interest to the other member at fair market value, it will be recognized that a modified form of free transferability exists. So the Kintner Regulations require that in this situation where you have a right of first refusal, that right of first refusal be at fair market value. That is only after having offered his interest at fair market value. There is no requirement in the settlement agreement for that transfer to happen at a fair market value. It may result... But there's no requirement that it doesn't. Yeah, there's no requirement at all whatsoever. And that is exactly the point. There needs to be a requirement in there under the Kintner Regulations in order for a modified form of free transferability to exist. I'd like to turn back, if I may, Your Honors, to limited liability. One of the other factors at issue here. This is purely a legal inquiry. The Kintner Regulations direct us to consider under local law whether a creditor of the organization could seek personal satisfaction from a member of the organization. Hence, there is no need for a factual inquiry as to whether actual liability exists or not, or whether a transaction actually had been denied or not, or whether the decision of the National Tax Authority referred to the denial of transaction liability. The only question is whether the Japanese legal structure allowed for personal liability of members of certain entities, and whether plaintiffs are members of such an entity. The case here is very clear. But the trial court failed to draw a distinction between FLPJ as a kabushiki kaisha and a dozoku kaisha. But FLPJ status as a dozoku kaisha is fundamental to understanding plaintiff's exposure to personal liability. For limited liability to be lacking under the Kintner Regulations, all that is needed is a legal framework under which the members of an entity could be personally liable to a creditor when the assets of the organization are insufficient to satisfy the creditor's claim. Here we have a creditor, the NTA, and the creditor's claim on the amount of tax that was said to be owing by FLPJ. Under Article 132 of the Corporation Tax Law, a transaction or accounting treatment by a dozoku kaisha will be denied with a resulting increase in tax if the transaction or accounting treatment is found to unduly reduce the tax. Under the Income Tax Law of Japan, Articles 157 and 168, the members themselves of the company can be made liable for this additional tax obligation as members of the company. Furthermore, under Article 36 of the National Tax Collection Act, the members can be made liable if they merely benefited from the transaction, not if they participated in the transaction. This is important because one of the underpinnings of the trial court's opinion here is that the members needed to participate in the underlying denied transaction in order to be liable for the resulting tax liabilities or profits that they received from it. And this is not true under Japanese tax law. Anybody who merely benefits, whether they caused the transaction that ultimately got denied or not, can be held liable for that ultimate liability. This is different than piercing the corporate veil, which is what the trial court based its ruling on under the participation in the transaction theory. This is a completely different type of liability and therefore not precluded or does not result in the limited liability contemplated by the kinder regulations. I see I'm almost out of time, Your Honors. I'm beyond my time. You are, in fact, out of time. Thank you, Mr. Wilson. Thank you. Mr. Catterall, representing the government. May it please the court, I'm Arthur Catterall, the Justice Department on behalf of the United States. I will start with the characteristic of centralized management. Let me make sure I understand. If we agree with you on limited liability and pre-transferability, we don't have to reach centralized management, is that right? Because there will be three of the four. Correct. Okay. Starting with centralized management, the court correctly found that, as is the case with the Board of Directors of a domestic statutory corporation, exclusive managerial authority resided in FLPJ's Board of Directors. The taxpayers' arguments to the contrary are unavailing. First, the taxpayers argue that because Mahon and Yamagata controlled the board by virtue of their respective 50% stock holdings, the board's managerial authority could not have been exclusive of the shareholders. Under that argument, as the court recognized, no closely held entity could ever have centralized management. As the regulations recognize, the essence of centralized management is that no owner can bind the entity simply by virtue of his status as an owner, and decisions of the management group do not require ratification of the owners in their capacity as such. Both of those conditions were indisputably present. Sorry, I don't mean to interrupt, but these regulations aren't in effect anymore. That is correct. And so this question of what constitutes centralized management, is this going to come up in any other cases? Probably infrequently, because the new regime took effect, I believe, January of 1997. So, you know, we're talking 18 years. I mean, it just seems to me that the regulation on this issue is not particularly well worded, and it's hard to understand. If it were going to have some kind of ongoing effect, it might make sense for us to sort it out. But if it doesn't, and we can affirm based on the other two, then I'm not sure why we would need to address what honestly seems to be a pretty badly written regulation. I would agree that the regulation is not the best drafted piece of administrative work. But, again, as you indicate, there will be very few cases going forward that implicate these regulations. I would like to point out another argument that the taxpayers make regarding centralized management, and that is that the managerial authority was not exclusively vested in the board because, according to them, representative directors of a Japanese joint stock company can act independently of the board. In our brief, we explain that representative directors are analogous to board members who also serve as officers of the company. They can act on behalf of the company in their capacity as officers, but only within the parameters established by the full board. In the reply brief, the taxpayers selectively cite to a portion of an excerpt from a Japanese corporate law treatise, which is page 542 of the joint appendix, that discusses the all-inclusive authority of representative directors, suggesting that this authority is independent of the board. But the surrounding pages of the treatise refute this notion. First, it's significant that this treatise refers to representative directors as, quote, president per in, representative of board of directors, close per in, which certainly sounds officer-like. This is from page 540 of the physical compilation of the joint appendix, and it's addressing the relationship between the board of directors and the president per in, representative of the board of directors, close per in, and specifically, the level of delegated authority to the president per in, representative of board of directors, in terms of business management decision-making. The board of directors is the decision-making body that deals with business management. The business management body that implements the decisions is the president per in, representative board of directors, and members of the board that are in charge of the operations. So the treatise continues that although decision-making authority on business management activities is placed in the board of directors, it is too troublesome for the board to determine everything in terms of daily business management activities. And that authority to run the day-to-day operations is delegated to the representative directors, and that's precisely analogous to a domestic statutory corporation. Can I get you to shift gears and talk a little bit about limited liability, and in particular, how would you respond to Mr. Wilson's argument about liability exposure of members of a dozoku kaisha? Right. I would just sort of recap. Under Article 132 of Japan's corporation tax law, the tax authorities can recharacterize transactions of a closely held company in order to more clearly reflect the company's true income, and this is the denial of transactions rule. And then Article 36 of the National Tax Collection Act provides that if the company fails to pay any increased tax resulting from such a recharacterization of the transaction, the tax may be collected from, quote, any individual who is deemed to have benefited from the transaction to the extent of such benefit. Now, the taxpayers claim that this potential liability destroys limited liability in the case of closely held corporations in Japan. But the Court of Federal Claims correctly rejected this argument, citing cases holding that the liability contemplated in the Kintner regulations is liability that attaches solely by reason of an owner's status as an owner, and liability that results from the owner's actions, as would be the case under Article 36, is not what the Kintner regulations are focused on. And on appeal, the taxpayers argued that because participation in the company's suspect treatment of a recharacterized transaction is not required for liability to attach under Article 36, it follows that such liability arises solely by reason of a shareholder's status as a shareholder. But that can't be true, since, as the taxpayers acknowledge, shareholder status is likewise not required for liability to attach under Article 36. All that is required is that the individual have benefited from the recharacterized transaction. Now, the taxpayers will argue that, well, the individuals who benefit will almost always be shareholders. But as we argued in our brief, those same shareholders will almost always be the ones behind the scheme, as they were in this case, so that as a practical matter, liability under Article 36 of the National Tax Collection Act derives from the shareholder's actions, not from his status as a shareholder. And in their opening brief, the taxpayers cite their own experts' rationale for this denial of transactions rule, and that is, in small family corporations, the members can easily adopt accounting treatments that unduly reduce the company's tax liabilities. So that is my response to the limited liability issue. And, again, the Court correctly noted that if the theoretical ability of an entity's creditor to reach an entity's owner in a single limited circumstance were sufficient to destroy limited liability under these regulations, it is unlikely that any closely held entity could ever be said to exhibit the corporate characteristic of limited liability. And I'd also point out that in that regard, this Article 36 of the National Tax Collection Act is somewhat analogous to the transferee liability provisions of the Internal Revenue Code, pursuant to which the IRS can collect unpaid taxes of a corporation from people who benefited from such nonpayment, i.e., as transferees of the corporation's assets. So if such potential liability in that narrow context could destroy limited liability, then no corporation could be said to afford its shareholders limited liability. Let me move you to the next item, the modified free transferability. And what is your response to Mr. Wilson's argument about the requirement that any transfer be at fair market value? Well, yeah, apparently the argument is that under the settlement agreement, the right of first refusal set forth in that agreement doesn't satisfy the standard in the regulations because it could result in the transferring shareholder obtaining more than fair market value for his shares. In other words, the taxpayers contend that a right of first refusal that provides freer transferability than the procedure described in the regulations, nonetheless, does not result in modified free transferability. Mr. Wilson's also arguing that the transfer might be to a person not of the seller's choice. But that's exactly what happens under, well, in this circumstance, under a right of first refusal. I mean, the regulations clearly contemplate that a right of first refusal is acceptable as long as it's at fair market value. And obviously, if somebody exercises the right of first refusal, then the transferring shareholder is not going to be transferring his shares to the person of his choice. And the regulations specifically expressly say that that's okay. And the only rationale for this argument that freer transferability doesn't satisfy the regulation is that the regulation must be applied as written. But nothing in the language of the regulation suggests that a right of first refusal that is more favorable to the transferring shareholder does not satisfy the regulation, and we would submit that such a rule would be nonsensical. And turning to Article VI of the settlement agreement, which mandated that Yamagata's estate or successors surrender the Yamagata shares upon Yamagata's death to the company in exchange for $10 million, and the taxpayers claim that that destroyed free transferability with respect to Yamagata's shares. As the court correctly found, Article VI did not restrict the transferability of Yamagata's shares at his death, as might have been the case if the provision had said that the shares would remain outstanding, but could only be sold to the company for $10 million. That's a different case, and that would presumably constitute a restriction on transferability. Instead, Article VI had the effect of terminating Yamagata's interest at his death in exchange for a $10 million termination payment. And there can't be a restriction on the transferability of an interest that no longer exists. And nor did Article VI impose any restrictions on the transfer of the Yamagata shares during Yamagata's life. The diminution in value that he could have received upon such a transfer would not have been attributable to an existing or future transfer restriction, but instead it would have been attributable to the impending termination of the ownership interest. And as a final observation on this point, as we noted in our brief, even if the right of first refusal procedure in the settlement agreement were somehow deficient, it could not have impaired free transferability prior to October 1992. And that is because the restriction was never reflected in the public registry of FLPJ. And prior to October 1992, the necessary restrictive legend was not stamped onto the shares. So it would have been unenforceable against a purchaser without notice of the restriction. And the same thing is true with Article VI. Even if it were deemed to effect a restriction on the transfer of the Yamagata shares, rather than effecting a termination of his interest at his death, it too would have been invalid prior to October 1992. At that point, a different entity was substituted for FLPJ as the ostensible purchaser of the shares. Before that time, it was FLPJ. And I don't think there's any dispute that the lawyers figured out that that was invalid under Japanese law. And I'd circle back to centralized management for the last point. And in particular, whether the parenthetical in the regulations precluded centralized management prior to October 1992 when the taxpayers transferred their shares to their respective holding companies. The parenthetical in question refers to collective management authority by any group of persons, which does not include all the members. And the court held that because prior to October 1992, all the shareholders were board members, the parenthetical precludes the finding of centralized management prior to October 1992. I don't have time to repeat all our arguments in this regard, but I would focus the court's attention on pages 38 to 39 of our brief, where we demonstrate if that parenthetical were merely a counting rule, as the lower court concluded, then every general partnership that delegates managerial authority to less than all the partners would exhibit the corporate characteristic of centralized management, contrary to the per se rule in dash 2C.4 of the regulations. Thank you, Mr. Catterall. Mr. Vaughan will provide the reply. Good morning, Your Honor. I'd like to just address a couple of the issues that you seem to be most interested in, and that's the liability and the transferability. A point that's not discussed by the government is, with respect to Mr. Yamagata's shares and whatever those restrictions were, the fact is that any recipient of those shares also had to agree to be bound by various other terms of the settlement agreement, including non-competition covenants, the sale price of Mr. Yamagata's debt. And that is far different than a mere transfer of shares at fair market value, and you get all of the shares and that's your transfer. You as a transferee would have to accept the restrictions that come along with those shares. So the modified free transferability, which the regulations themselves define as having less weight than actual free transferability, define the modified form as only when there's a requirement for a first offer to your co-member at fair market value. That element of offering that fair market value to Mr. Maughan is just absent in this case, and under the regulations as written, then, the modified form of free transferability wouldn't exist. With respect to the limited liability aspect, the regulations speak in terms of the potential for liability. If there's a legal structure that would allow a member, because he's a member, to be held personally liable for an entity's obligations, then that aspect of limited liability is absent. And we have looked at this status as a DK. The government points out that any person who benefited could also be liable, even if they're not a member, but that doesn't negate the fact that under the regulations, if a member could be liable to a creditor, then limited liability doesn't exist under the regulations. But that liability doesn't stem from that member's status as a stockholder, necessarily. Not under Article 36, but it would under... Stems from the fact that that party allegedly benefits. That's true under Article 36, but under Articles 157 and 168, as members, as shareholders, they would have liability because of that status. And my time has expired. Thank you. Thank you. Mr. Vaughan will take the case under advisement.